IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| MARYA JAMES, | ) | Civil Action No. 3:11-635-CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff applied for SSI on November 26, 2007, alleging disability as of October 12, 1990. Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on October 15, 2009, at which Plaintiff, her mother, a medical expert, and a vocational expert ("VE") appeared and testified. On February 19, 2010, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled. The ALJ, after hearing the testimony of the VE, concluded that work exists in the national economy which Plaintiff can perform.

Plaintiff was twenty-eight years old at the time of the ALJ's decision. She has a high school education, achieved through special education, and no past relevant work. See Tr. 47, 136, 167. Plaintiff alleges disability due to a seizure disorder. Tr. 131, 162, 207.

The ALJ found (Tr. 16-20):

1.     The claimant has not engaged in substantial gainful activity since November 26, 2007, the application date (20 CFR 416.971 *et seq*.).

2.     The claimant has the following severe impairments: seizure disorder and depression (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, I find that the claimant has the physical residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 416.967(c). Specifically, I find that the claimant can lift and carry up to fifty pounds occasionally and twenty pounds frequently. She can sit up to six hours total in an eight hour workday, stand/walk up to six hours total, and had unlimited use of her upper and lower extremities for pushing and pulling, as well as operation of hand or foot controls. She can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but should avoid ladders, ropes, scaffolds, unprotected heights, and machinery with moving parts. There are no visual, manipulative, or communicative limitations. The claimant can follow short, simple instructions and perform simple, routine tasks. She can sustain her attention and concentration for two hours at a time, occasionally interact or have contact with the public, and may be absent from work one to two days per month on an unscheduled basis.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on October 12, 1981. She was 26 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant has a high school education, achieved through special education, and she is able to communicate in English (20 CFR 416.964).

2

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since November 26, 2007, the date the application was protectively filed (20 CFR 416.920(g)).

On January 20, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. Tr. 1-6. Plaintiff then filed this action in the United States District Court on March 16, 2011.

## STANDARD OF REVIEW

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

## MEDICAL EVIDENCE

On September 29, 2006, Plaintiff was examined in the Spartanburg Regional emergency room for complaints of a seizure disorder with confusion, treated with medication, and released. Tr. 239-247. Plaintiff was treated in the emergency room again on November 28, 2006 for seizure and

confusion. She was advised to continue with her Dilantin (100 mg. three times daily), and was referred to the Neurology Centers of the Carolinas ("NCC") for evaluation. Tr. 224-228.

Dr. Zortea of the NCC evaluated Plaintiff for seizure activity and scheduled an MRI for December 13, 2006. Tr. 255. The MRI revealed no abnormalities except for mild frontal sinus disease. Tr. 248-49, 275-76, 341-42. The following day, she underwent an electroencephalogram ("EEG") study which was abnormal and showed epileptogenic activity with recurrent sharp waves in the left fronto-temporal region. Tr. 277. On December 27, 2006, Dr. Zortea saw Plaintiff for a follow-up visit. He noted that Plaintiff's Dilantin level was "subtherapeutic" and increased her dosage of Dilantin to 200 mg. twice daily. Tr. 253. However, in a visit on June 26, 2007, Dr. Zortea noted that it appeared Plaintiff was noncompliant with her medications (taking only 100 mg. twice a day). He increased her Dilantin to 100 mg. in the morning and 200 mg. in the evening, and further recommended that Plaintiff be compliant with her medication. Tr. 259.

Plaintiff told Dr. Zortea on September 24, 2007, that she was six months pregnant and had a seizure three days prior. Dr. Zortea prescribed Dilantin, 200 mg. twice daily, and noted Plaintiff was aware that anti-seizure medications could affect her pregnancy. Tr. 272. On November 14, 2007, Plaintiff reported no further seizure activity to Dr. Zortea. Tr. 390. Plaintiff gave birth to her baby without complications on November 22, 2007. At that time, she reported a history of smoking, alcohol consumption, and illicit drug use. Tr. 356, 358.

On December 14, 2007, Plaintiff was treated in the emergency room for seizure activity followed by confusion and incontinence. Tr. 366-367. On December 18, 2007, laboratory results showed Plaintiff had Dilantin levels that exceeded the therapeutic range, and it was noted that Plaintiff should be evaluated clinically for signs of potential toxicity. Tr. 386.

On December 21, 2007, Dr. Zortea wrote that Plaintiff's recent seizure activity was most likely secondary to noncompliance with medication. Dr. Zortea diagnosed seizure disorder, and discussed with Plaintiff the importance of compliance with Dilantin, and noted that she did not appear to have signs of Dilantin toxicity. Tr. 389.

On January 31, 2008, Plaintiff presented to the emergency room with complaints of seizures. She reported taking Dilantin and was noted to be semi-compliant with her medications. Seizure disorder was diagnosed, Dilantin was prescribed, and follow-up with Dr. Zortea was recommended. Tr. 362-65. Laboratory testing on February 14, 2008, showed Plaintiff had therapeutic Dilantin levels. Tr. 388. On February 18, 2008, Dr. Zortea noted that, since January, Plaintiff had no further seizure activity. Tr. 402. Plaintiff denied ataxia, dizziness, or drowsiness. Dr. Zortea found she was awake, alert, and oriented to time, place and person, and had fluent and coherent speech. Id. Dr. Zortea increased Plaintiff's Dilantin level. Tr. 402-403.

On February 26, 2008, Dr. James Ruffing, a psychologist, examined Plaintiff at the request of the state agency. Plaintiff stated she had seizures two to three times per month and visual difficulties in the right eye. She reported she could not stay alone with her children because of her seizures, lived with her mother, and spent her time taking care of her children. She went to the store with her mother, helped prepare meals, clean, and do laundry. Tr. 395. Plaintiff stated she had depression, but at the time of the examination did not feel depressed. She reported suicidal ideation and a recent suicidal attempt, but also reported she had never undergone any mental health intervention. Tr. 393-396.

Dr. Ruffing found that Plaintiff was fully oriented and had relevant and coherent thoughts. He found she could understand and respond to the spoken word; understand, remember, and carry

out simple to detailed instructions; and perform simple to repetitive tasks. Dr. Ruffing stated that Plaintiff would have difficulty maintaining concentration, persistence, and pace required in a typical work environment. Testing revealed that Plaintiff had a verbal IQ of 63, performance IQ of 68, and full-scale IQ of 62. Dr. Ruffing noted that these scores were lower than expected based on her ability to interact and respond as well as her reading ability which tested at the fifth grade level. He thought the scores might be lower than expected because of Plaintiff's difficulties with attending, focusing, and concentrating. Tr. 393-396.

On March 14, 2008, Dr. Carl Anderson, a state agency physician, reviewed the evidence and completed a Physical Residual Functional Capacity Assessment. He opined that Plaintiff had no exertional limitations, but she should never climb ladders, ropes, or scaffolds and avoid even moderate exposure to hazards (machinery, heights, etc.). Tr. 405-412.

On April 4, 2008, Dr. Larry Clanton, a state agency psychologist, reviewed the evidence and completed a Psychiatric Review Technique Form. Dr. Clanton opined that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Clanton also completed a Mental Residual Functional Capacity Assessment in which he opined that Plaintiff could carry out very short and simple instructions and would work best in situations not requiring ongoing interaction with the public. He further stated her mental impairments were severe, but would not preclude the performance of simple, routine work activities. Tr. 413-429. On May 14, 2008, Dr. Xanthia Harkness, another state agency psychologist, reviewed the evidence and agreed with Dr. Clanton's assessment. Tr. 198.

On May 14, 2008, Dr. Dale Van Slooten, a state agency physician, reviewed the evidence and completed a Physical Residual Functional Capacity Assessment. He opined that Plaintiff had no exertional impairments, but could never climb ladders, ropes, or scaffolds and should avoid even moderate exposure to hazards. Tr. 432-438.

On July 7, 2008, Plaintiff reported to Dr. Zortea that she had been compliant with medications and her last seizure occurred the prior week. Dr. Zortea noted she had been "stable" on Dilantin. Tr. 441. Testing revealed that Plaintiff's Dilantin levels were too high. Tr. 445. On August 5, 2008, Dr. Zortea noted Plaintiff "ha[d] not been consistent with her dosage of Dilantin." Plaintiff said she "t[ook] an extra dosage when she fe[lt] she [was] about to have a seizure," but "skip[ped] other dosages." She said she had her last seizure three to four days prior and she had seizures every two weeks. Dr. Zortea noted Plaintiff had not followed up on instructions to check her Dilantin levels. He found she was awake, alert, and oriented times three with coherent speech, good eye contact, and appropriate mood. Dr. Zortea recommended a blood test, noting Plaintiff seemed to understand his instructions. Tr. 440.

On August 19, 2008, Plaintiff sought treatment at Spartanburg Area Mental Health ("SAMH"). She reported depressive symptoms and auditory hallucinations. She said she used alcohol for twelve years and marijuana daily for the prior two months. She reported smoking half a pack of cigarettes per day and that she had "the shakes from not using marijuana." Plaintiff's diagnoses was mood disorder and rule out depression with recurrent psychosis. Plaintiff was assigned a GAF score of 50.[1] It was noted Plaintiff and her mother were poor historians and lacked

---

[1]The GAF contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning, generally for the level of functioning (continued...)

insight into Plaintiff's problems. It was thought that Plaintiff was most likely mentally retarded or had borderline intellectual functioning and "likely" had psychotic symptoms. Tr. 465-472.

On August 26, 2008, Plaintiff presented to Dr. Arthur Pedersen of SAMH, complaining of depressive symptoms and hearing voices telling her to hurt herself or others. Plaintiff's mother reported that Plaintiff had gone over a month without having a seizure. Dr. Pedersen noted Plaintiff had some withdrawal symptoms when using marijuana in the past, drank alcohol and used marijuana for twelve years, and smoked a half-pack of cigarettes per day. He found she was alert and oriented times three and had normal thoughts and no hallucinations, delusions, or homicidal or suicidal ideation. He prescribed Invega (an anti-psychotic medication). Tr. 460.

On November 3, 2008, Plaintiff presented to Frank Forsthoefel, M.D., with complaints of depression, hearing voices, and a recent attempt to hurt herself with a knife. Dr. Forsthoefel noted that Plaintiff had used marijuana in the past, but "[t]here was no history of drug nor alcohol use or abuse." He noted that Plaintiff spoke logically and coherently, appeared mildly despondent, and endorsed voices telling her to hurt herself or others. Dr. Forsthoefel diagnosed postpartum psychosis; prescribed Invega, Lexapro, and Ativan; and assigned a GAF score of 50. Tr. 459. On November 19, 2008, it was noted that Plaintiff reported improvement in her mood and decreased

---

[1](...continued)

at the time of evaluation. A GAF score between 21 and 30 may reflect that "behavior is considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment." A score of 31 to 40 indicates some impairment in reality testing or communication or "major impairments in several areas," 41 to 50 indicates "serious symptoms" or "serious difficulty in social or occupational functioning," 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning," and 61 and 70 reflects "mild symptoms" or "some difficulty in social, occupational, or school functioning ." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

auditory hallucinations with medications. It was further reported that Plaintiff had limited insight and communication skills. Tr. 464.

On January 5, 2009, Plaintiff reported seizure activity, depression, and difficulty sleeping with nightmares. Dr. Zortea noted she had been compliant with medication and recommended a possible second seizure medication. He also prescribed Lexapro. Tr. 450. A blood test the same day showed subtherapeutic Dilantin levels. Tr. 453. On February 26, 2009, Plaintiff denied any seizure activity. She reported taking care of her two children. Tr. 449. A blood test the same day showed Plaintiff had subtherapeutic Dilantin levels. Tr. 452.

On April 17, 2009, Plaintiff told Dr. Forsthoefel she was noncompliant with her mental health treatment. She reported being less functional in her activities of daily living and more withdrawn. She said she missed her medication and heard occasional voices. She thought Invega and Lexapro helped her a great deal. Dr. Forsthoefel found Plaintiff was alert, pleasant, and spoke logically and coherently, but was despondent with problems in attention span, memory, and comprehension. Dr. Forsthoefel assigned a GAF score of 40 and prescribed Lexapro and Invega. Tr. 458.

On June 5, 2009, Plaintiff denied any seizure activity in the recent past and reported compliance with Dilantin. Dr. Zortea found she had good coordination and could follow simple and complex commands. He thought her seizure activity was well-controlled with medication and noted she had been noncompliant in the past. Tr. 448. Plaintiff's Dilantin level the same day was in the therapeutic range. Tr. 451.

After the ALJ's decision, Plaintiff submitted additional medical records to the Appeals Council, as discussed below. On June 12, 2009, Dr. Forsthoefel noted that Plaintiff reported functioning well after she stopped taking Lexapro and Invega which she thought made her worse.

Dr. Forsthoefel rated Plaintiff's GAF as 60 and said no psychiatric medications were indicated at that time. Tr. 497. On September 2, 2009, Dr. Forsthoefel stated that Plaintiff "is so stressed out at this time with concentration and memory difficulties and tenuous improvement with respect to her psychotic condition that she can no longer work at this time." He rated her GAF score as 50 and prescribed Abilify. Dr. Forsthoefel further stated:

> Patient is totally and permanently disabled from all work at this time because of the tenuous aspects of her recovery and the risk aspects of recurrence with associated concentration and memory difficulties and inability to perform some of her activities of daily living.

Tr. 496.

The record also contains an unsigned, undated letter which Plaintiff asserts is from Dr. Forsthoefel. The letter provides:

> [Plaintiff's] problems are not drug related. She is better with treatment, but her improvement is tenuous. She continues to have difficulty concentrating and remembering. I do feel that she has continuing concentration and memory problems particularly aggravated by stress. If she went back to work, I could see her deteriorating. She had a background of voices prior to this postpartum depression. She is very stress sensitive. She has situational stressors at home that aggravate and complicate her emotional problems. At least during the time period that I have treated her, she has not been able to concentrate enough to maintain concentration on even simple tasks throughout an eight hour work day. Also, she would not be able to remember simple instructions well enough to carry them out correctly on a consistent basis.

Tr. 514.

On November 13, 2009, Dr. Katherine Kreiser of SAMH noted that Plaintiff was being followed for psychotic disorder, she was more irritable on Abilify, she had thoughts of suicide, and she reported recent seizure activity (but could not remember exactly when). Plaintiff reported feeling more depressed for the previous two months. She admitted to transient thoughts of hurting

her children, but without any intent. Dr. Kreiser discontinued Abilify and restarted Plaintiff on Lexapro and Invega. Tr. 478.

On November 20, 2009, Dr. Forsthoefel indicated that Plaintiff was in complete remission from her postpartum psychosis. Plaintiff reported that she was functioning beautifully in the area of childcare. Her GAF score was rated at 60 and it was decided she would discontinue Lexapro and Invega. Tr. 477.

Dr. Zortea completed a seizure questionnaire on June 21, 2010. He noted that Plaintiff had generalized seizures which were categorized as tonic-clonic with loss of consciousness. The average frequency of her seizures was once a week and four times a month. Dr. Zortea stated that the seizures typically lasted a few minutes and Plaintiff experienced postictal manifestations for approximately thirty minutes following a seizure, which included confusion, exhaustion, irritability, severe headache, and muscle strain. Dr. Zortea indicated that Plaintiff did not always have warning of an impending seizure and that she had a history of fecal and urinary incontinence during the seizures. He opined that the postictal manifestations greatly affected her daily activities. Dr. Zortea stated that Plaintiff was compliant with taking Dilantin which partially controlled her seizures. He listed the side effects of Dilantin as dizziness, eye focusing problems, lethargy, coordination disturbance, and lack of alertness. She did not exhibit signs of ethanol-related seizures or ethanol or other drug abuse. Dr. Zortea opined that Plaintiff's seizures would likely disrupt the work of co-workers and would require Plaintiff to need more supervision at work than an unimpaired worker. He also stated that Plaintiff could not work at heights, could not work with power machines that required an alert operator, could not operate a motor vehicle, and could not take the bus alone. Dr. Zortea opined that during an eight-hour workday, Plaintiff would need unscheduled breaks

approximately every two hours, would have to rest for about fifteen minutes before returning to work, and was incapable of tolerating even "low stress" jobs.  Tr. 486-488.

On August 25, 2010, it was noted on a discharge sheet that Plaintiff dropped out of SAMH's services and she endorsed improvement in symptom control although her GAF score remained at 50. Tr. 518.  The next day, however, it was noted on a SAMH triage form that Plaintiff presented for treatment with suicidal ideation, destructive behavior, violent threats and behaviors, agitation and irritability, hyperactivity, disruptiveness, attention-seeking behavior, auditory hallucinations, change in sleep patterns, depressed mood, tearfulness, low energy and fatigue, hopelessness, seizures, and headaches.  Marijuana use and episodic alcohol use were noted.  Plaintiff reportedly recently took her three-year old daughter out at 11:00 pm while Plaintiff met with men.  Tr. 519-520.

On September 2, 2010, Dr. Zortea wrote a statement regarding his four-year treatment of Plaintiff for seizures.  He noted that Plaintiff's seizures were verified by a number of markedly abnormal EEGs. Dr. Zortea explained that Plaintiff initially had issues with noncompliance with her medications.  He believed noncompliance was "largely due to her low cognitive functioning causing her difficulty with understanding what she needed to do."  Dr. Zortea wrote that Plaintiff had been compliant with her medications since September 2007 and that Plaintiff's occasionally low Dilantin levels since that time were most probably attributable to normal variances in metabolism rather than noncompliance.  He stated that Plaintiff continued to have frequent seizure activity (averaging once a week) despite compliance with medication.  Dr. Zortea stated:

> She seems credible to me regarding her reports of seizures.  I have observed her to be confused and incoherent just following a seizure.  She has always presented as someone with limited cognitive functioning.  For about a day following seizure, Ms. James would be confused and sleepy.  She would experience severe postictal manifestations such as incoherence for about 30 minutes just following a seizure. The side effects of her medications could also cause her some fatigue and mental

12

fogginess. Due to her frequent seizure activity, she would miss well over 3 days of work per month on average. [Plaintiff] would not be able to work due to her seizure disorder alone. However, her low cognitive functioning would also cause her serious limitations in the work place.

Tr. 491.

Ms. Wendy Davis, a social worker at SAMH, completed a progress report on November 9, 2010. Ms. Davis stated that Plaintiff made little progress due to issues of compliance. She stated that Plaintiff continued to need services, but required constant prompting to follow-up and keep appointments. Ms. Davis noted that Plaintiff's family was not as helpful as was initially thought. Plaintiff continued to report hallucinations, paranoia, and mood irritability. Ms. Davis opined that Plaintiff "does as well as she is able but remains in need of services." Tr. 479.

## HEARING TESTIMONY

At the hearing, Plaintiff testified that she was enrolled in special education classes in school and had virtually no work experience. Tr. 26-28. She alleged disability due to seizures characterized by loss of consciousness. Tr. 28-30. She also testified to memory, comprehension, and emotional problems. Tr. 30, 33-35, 36. Regarding her daily activities, Plaintiff testified that she stayed home, performed housekeeping chores, prepared simple foods, and cared for her two-year-old daughter with assistance from her mother. Tr. 29-30. She stated she had a four-year-old son who attended school during the day. Tr. 31.

Plaintiff's mother, Cornelia Smith, also testified at the hearing. She stated that Plaintiff's doctors told her that Plaintiff could not work or drive because of seizures. Ms Smith has custody of Plaintiff's older child and was in the process of getting custody of the younger child. Tr. 40. She testified that Plaintiff takes medication, but sometimes forgets to take it. She stated that Plaintiff told her she quit smoking marijuana and drinking alcohol in November 2008. Tr. 42. Ms. Smith stated

that when Plaintiff has a seizure she does not talk, she shakes, her eyes go in the back of her head, and she urinates or has a bowel movement. Tr. 43. After the seizure, Plaintiff usually slept for four to six hours. Ms. Smith estimated that she witnessed Plaintiff having a seizure approximately two to three times a month. Tr. 44.

Dr. C. David Tollison, a medical expert, also testified at the hearing after reviewing Plaintiff's medical records and listening to testimony from Plaintiff and her mother. Dr. Tollison opined that Plaintiff's primary impairment was a seizure disorder, with some secondary psychological symptoms and questionable compliance with psychotropic medications. Tr. 45. He did not believe that Plaintiff's current psychological symptoms were markedly limiting of her functional ability. Tr. 45. In response to a question from Plaintiff's attorney as to whether organic mental disorders go along with seizures (in particular where there are positive EEGs), Dr. Tollison replied "yes." Dr. Tollison also "guessed" that noncompliance could be a secondary result of the organic mental disorder. Tr. 46-47.

## DISCUSSION

Plaintiff alleges that: (1) the ALJ failed to properly consider treating physician Dr. Forsthoefel's opinion of disability; (2) the ALJ improperly denied Plaintiff's claim based on Plaintiff's noncompliance; (3) the ALJ failed to assess the credibility of lay testimony (testimony form Plaintiff's mother); and (4) the ALJ failed to properly evaluate the new evidence before it. The Commissioner contends that the final decision that Plaintiff is not disabled within the meaning of the Social Security Act is supported by substantial evidence[2] and free of reversible legal error.

_____

[2]Substantial evidence is:
  evidence which a reasoning mind would accept as sufficient to support a
                 (continued...)

A.    New Evidence Before the Appeals Council/Treating Physicians' Opinions

Plaintiff argues that the Appeals Council erred in rejecting the new evidence submitted to it without explaining its reasons for doing so. She contends that the new evidence shows that her impairments would cause significant problems attending work, and directly addresses the ALJ's concerns with compliance issues. Plaintiff appears to argue that, in light of the new evidence, the ALJ's decision is not supported by substantial evidence. The Commissioner contends that the Appeals Council was not required to explain its reasons for rejecting the new evidence presented to it because substantial evidence in the record as a whole (including the evidence presented to the Appeals Council) supports the ALJ's decision. Additionally, the Commissioner argues that the records presented to the Appeals Council are cumulative and unpersuasive when considered in light of the record as a whole. Specifically, the Commissioner argues that Dr. Forsthoefel's opinions are ones on the ultimate issue of disability (which is reserved to the Commissioner), are inconsistent with his own treatment notes, and are inconsistent with other evidence in the record. The Commissioner argues that Dr. Zortea's opinions do not relate back to the period at issue, are statements that concern the ultimate issue of disability, and are inconsistent with his own treatment notes.

---

[2](...continued)
   particular conclusion. It consists of more than a mere scintilla of evidence but
   may be somewhat less than a preponderance. If there is evidence to justify a
   refusal to direct a verdict were the case before a jury, then there is "substantial
   evidence."
Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

When the Appeals Council considers additional evidence offered for the first time on administrative appeal and denies review, courts must consider the record as a whole, including the new evidence, in determining whether the ALJ's decision is supported by substantial evidence. Meyer v. Astrue, 662 F.3d 700, 707 (4th Cir. 2011); see Wilkins v. Secretary Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir.1991)(en banc). In Meyer, the Fourth Circuit held that it is not necessary for the Appeals Council to state reasons for its decision not to review the ALJ decision. When the Appeals Council receives additional evidence and denies review, the issue for the reviewing court becomes whether the ALJ's decision is supported by substantial evidence or whether a remand is necessary for the ALJ to consider the new evidence. In Meyer, the plaintiff's treating physicians had a policy not to provide opinion evidence for Social Security proceedings. Therefore, the ALJ was not provided with any opinions by treating physicians. After the issuance of the ALJ's decision, the claimant was able to obtain an opinion letter from his treating physician, and the Appeals Council made the letter a part of the record but found that it did not provide a basis for changing the ALJ's decision. The Fourth Circuit remanded the case for further fact-finding because "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." Id. at 707.

It is recommended that this action be remanded to the Commissioner to consider the new evidence submitted to the Appeals Council in light of all of the evidence. The Appeals Council in this case stated, without explanation, that it "found that this information does not provide a basis for changing the Administrative Law Judge's decision." Tr. 2. Here, similar to the situation in Meyer, Plaintiff's treating physicians did not give any opinions as to her limitations or as to disability prior to the ALJ's decision. The new evidence includes opinion evidence from Dr. Forsthoefel, a treating

psychiatrist, as well as from Dr. Zortea, Plaintiff's treating neurologist.[3]  This evidence appears to conflict with evidence credited by the ALJ (including that of the state agency physicians, state agency psychologist, and the medical expert).  Contrary to the Commissioner's argument, at least some of this evidence appears to relate to the relative time period (for example, Dr. Zortea's September 2010 statement).

Additionally, the ALJ gave great weight to the opinion of Dr. Tollison, the medical expert who testified at the hearing, that Plaintiff's psychological symptomatology was not markedly limiting of her functional abilities.  Tr. 18.  Dr. Tollison appears to have based his opinion at least in part on his belief that Plaintiff's mental impairments of postpartum depression or psychosis were not permanent.  See Tr. 46.  The medical records submitted to the Appeals Council, however, show continued mental impairments including depression.  The new evidence may also conflict with the evidence used to support the ALJ's credibility finding, as discussed below.

---

[3]The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).  Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).  Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."  Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. § 404.1527.  Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p.

B.     Credibility/Noncompliance

Plaintiff alleges that the ALJ erred in evaluating her credibility.[4]  She argues that the ALJ also erred in regard to finding her noncompliant with treatment.  The Commissioner contends that the ALJ properly considered Plaintiff's subjective complaints and found they were not credible based on Plaintiff's activities of daily living, because Plaintiff's symptoms were controlled by medications, and because Plaintiff was not compliant with her medication therapy.

In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record.  See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994).  Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he or she suffers.  A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The new evidence submitted to the Appeals Council includes information concerning Plaintiff's compliance with taking her medications and reasons as to why she may have not been

---

[4]Plaintiff also argues that the ALJ impermissibly found her disabled based on noncompliance. Review of the ALJ's decision, however, does not show that the ALJ did so, but instead that he discounted Plaintiff's credibility in part due to noncompliance.

compliant (including her mental abilities). The ALJ discounted Plaintiff's credibility due to her noncompliance with taking her prescribed medications. <u>See</u> Tr. 18. The new evidence also contains information concerning whether Plaintiff's medications controlled her conditions . The ALJ appears to have discounted Plaintiff's credibility because her medications controlled her symptoms. <u>See</u> Tr. 18. This action should be remanded to the ALJ to consider Plaintiff's credibility in light of all of the evidence, including the new evidence submitted to the Appeals Council.

      C.     <u>Lay Testimony</u>

      Plaintiff alleges that the ALJ erred in failing to assess the credibility of Plaintiff's mother which supported Plaintiff's testimony. The Commissioner contends that the testimony of Plaintiff's mother's should be discounted for the same reasons the ALJ discounted Plaintiff's testimony (that it was inconsistent with Plaintiff's activities of daily living, it was inconsistent with evidence that Plaintiff's symptoms could be controlled with medication, and Plaintiff was noncompliant with taking her treatment.

Upon remand, the ALJ should also articulate what weight is given to the testimony of Plaintiff's mother. In determining a claimant's residual functional capacity, "the ALJ must consider the relevant medical evidence and other evidence of the claimant's condition in the record, including testimony from the claimant and family members." <u>Morgan v. Barnhart</u>, 142 F. App'x. 716, 720 (4th Cir. 2005)(citing 20 C.F.R. § 404.1529(c)(3))). Here, the ALJ stated that Plaintiff's mother testified that Plaintiff experienced an average of two to three seizures per month followed by a prolonged period of fatigue and drowsiness, and Plaintiff takes seizure medication but forgets to take it a lot of times. Tr. 17. The ALJ, however, did not state what weight was placed on this testimony. Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise

contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the lay witness's testimony. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir.1995); Carlson v. Shalala, 999 F.2d 180 (7th Cir.1993); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir.1992); Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.1984).

It is unclear why the testimony of Plaintiff's mother was discounted. Plaintiff was unable to recall the frequency and details of her seizures. Her mother's testimony provides additional information concerning this. Her mother also provided further information concerning Plaintiff's ability to comply with the taking of her prescribed medications. Thus, it cannot be said that the testimony of Plaintiff's mother merely repeats the allegations of a plaintiff's own testimony. Additionally, in light of the new evidence submitted to the Appeals Council it is unclear whether the ALJ's determination concerning Plaintiff's credibility is supported by substantial evidence. Upon remand, the ALJ should weigh the lay testimony of Plaintiff's mother in light of all of the evidence and articulate reason(s) for rejecting or accepting this testimony.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to consider the evidence submitted to the Appeals Council, consider the opinions of Plaintiff's treating physicians, consider the lay witness testimony of Plaintiff's mother (Ms. Smith), and determine Plaintiff's credibility in light of all the evidence.

RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four

of 42 U.S.C. §§ 405(g) and 1383(c)(3), and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

August 16, 2012
Columbia, South Carolina